<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| VIN MONTES<br><br>　　Plaintiff,<br><br>　　v.<br><br>PAYMENTUS GROUP, INC.,<br><br>　　Defendant. | No. 24cv7450 (EP) (JBC)<br><br>**OPINION** |

**PADIN, District Judge.**

This action was filed by Plaintiff Vin Montes ("Montes" or "Plaintiff") against Defendant Paymentus Group, Inc. ("Paymentus" or "Defendant") and stems from Paymentus's acquisition of an electronic billing and finance company, Profit Financial, Inc. ("Profit"), which Montes founded. Montes alleges that Paymentus breached its acquisition contract with Montes (Count I) and seeks specific performance (Count II). D.E. 1 ("Complaint" or "Compl.").[1] Montes also alleges that Paymentus retaliated against him for insisting on the terms of the acquisition agreement in violation of New York Labor Law Section 215 (Count III) and New Jersey Statute Section 34:19-3(C) (Count IV). *Id.*

---

[1] The parties do not dispute subject matter jurisdiction in this case. However, the Court has an independent duty to determine that it has subject matter jurisdiction. The Court is satisfied that diversity jurisdiction exists pursuant to 28 U.S.C. § 1332. Plaintiff is an individual residing in New Jersey. Defendant is a Delaware corporation with its principal place of business in North Carolina. Furthermore, the amount in controversy is in excess of $75,000.

Paymentus moves to compel arbitration of all claims. D.E. 13-1 ("Motion" or "Mot.").[2] The Court decides the Motion without oral argument. See Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). The Court will **GRANT** the Motion, **COMPEL** arbitration of all Counts, and **STAY** this case. '

## I. BACKGROUND

### A. Allegations in the Complaint[3]

#### 1. *Paymentus acquires Profit*

In 2019, Plaintiff founded Profit, a company focused on "making it convenient for small business owners to manage their business finances by providing them with employee debit cards, budgeting software, bill payment, automated bookkeeping, and banking services such as ACH, Wires, and mail check payments along with checking accounts all in one place." Compl. ¶ 7.

In 2022, non-party Dushyant Sharma ("Sharma"), Paymentus's CEO, approached Montes to discuss the prospect of Paymentus acquiring Profit. *Id.* ¶ 9. Montes agreed and Paymentus, Profit, and Montes, amongst others, entered into a Share Purchase Agreement in December 2022. *Id.* ¶ 10; D.E. 13-2 ("Gerber Cert."), Ex. 1 (the "Share Purchase Agreement" or "SPA").

The SPA was designed to incentivize Montes to remain employed at Paymentus following the acquisition for at least seven years. Compl. ¶ 13. The SPA provides that Plaintiff would be awarded three traches of Restricted Stock Units ("RSUs"). *Id.* ¶ 10. The first tranche was to be awarded within 30 days of the acquisition close with 25% vesting each year thereafter for four

---

[2] Although the Motion seeks dismissal of this action in addition to compelling arbitration, Defendant later requests that the Court stay the action rather than dismiss it. D.E. 18 ("Reply") at 1, 9.
[3] As discussed *infra*, Section II, the Court applies the summary judgment standard found in Federal Rule of Civil Procedure 56 to this Motion. Therefore, the Court does not presume the allegations in the Complaint to be true for purposes of the Motion. The Court summarizes the allegation in the Complaint here as contextual background to the arbitrability dispute that is the focus of the Motion.

years.  *Id.*  The second tranche was to be awarded within 30 days of the first anniversary of the acquisition close with 25% vesting each year thereafter for four years.  *Id.*  The third tranche was to be awarded within 30 days of the second anniversary of the acquisition close with 25% vesting each year thereafter for four years.  *Id.*  Together, these three tranches had a value at the time of grant in excess of $2.8 million.  *Id.*  In the event Montes was terminated without cause, the SPA required that he will vest in the entirety of the first tranche if it is not already fully vested.  *Id.*  The SPA also required Paymentus to issue cash payments totaling $1,400,850 to Montes in the third and fourth years following the acquisition if he remained at Paymentus.  *Id.*  ¶ 12.

        2.     *Paymentus breaches the SPA by failing to make required payments to Montes and attempts to force new terms on Montes*

January 18, 2024 was the 30th day from the first anniversary of the acquisition close when, pursuant to the SPA, Paymentus was required to issue the second tranche of RSUs to Montes and to vest 25% of the first tranche of RSUs; Paymentus refused to do either.  *Id.*  ¶ 17.  Sharma then sent Montes a new agreement that would have removed Paymentus's existing RSU and retention bonus obligations under the SPA and replace them with less advantageous terms for Montes.  *Id.* ¶ 19.  However, Montes refused to sign the new proposed agreement and insisted on the terms of the SPA.  *Id.* ¶ 20.  In response, Sharma threatened to fire Montes if he did not agree to new terms.  *Id.* ¶ 21.

        3.     *Paymentus terminates Montes, in further breach of the SPA*

On April 24, 2024, when Montes again refused to agree to new compensation terms, Sharma told him that he was fired.  *Id.* ¶ 23.  However, the next morning, Sharma recanted, stating that he had not, in fact, fired Montes and demanded again that Montes agree to new compensation terms.  *Id.* ¶ 24.  Montes, again, refused.  *Id.*

On April 26, 2024, Andrew Gerber, Paymentus's General Counsel, told Montes that he was fired effective immediately. *Id.* ¶ 25. That same day, Gerber sent Montes a memo stating that his employment had been terminated "for cause" under the SPA due to performance issues. *Id.* ¶ 26. However, Montes did not think this was a legitimate justification as Montes had performed strongly at Paymentus, never received a negative performance review and was never placed on a Performance Improvement Plan, which was Paymentus's practice for poorly performing employees. *Id.* The real motivation for deeming Montes's termination "for cause" was that, for a termination *without* cause, the SPA requires Paymentus to vest the entirety of the first tranche of RSUs (valued at $1,724,096) or pay Montes the cash equivalent. *Id.* ¶ 27.

Furthermore, the SPA requires that a termination "for cause" be explained in writing "describing in reasonable detail, the events which constitute Cause and, to the extent practicable, the conduct required to cure such Cause," and allows Montes to cure such cause within 30 days from the termination notice. *Id.* ¶ 28. Paymentus did not provide the required explanation and did not provide Montes with an opportunity to cure the alleged "cause." *Id.*

> **B.** **The Relevant Agreements**

On December 6, 2022, Montes signed an employment offer letter and executed a Business Protection Agreement attached to the letter. D.E. 17 ("Montes Decl.") ¶¶ 2, 4; D.E. 17-1 ("Dec. 6 Offer Letter"); D.E. 17-3 ("Business Protection Agreement" or "BPA"). On December 21, 2022, Montes signed a revised employment offer letter, which attached the same BPA that Montes had previously executed on December 6, 2022. Montes Decl. ¶ 3; D.E. 17-2 ("Dec. 21 Offer Letter") (together with the Dec. 6 Offer Letter, the "Offer Letters").

The Offer Letters generally address Montes' salary and benefits. They both state that the Offer Letters contain "merely a summary of the principal terms of our employment offer" and that

4

each letter "is not a contract of employment for any definitive period of time and does not otherwise confer any contractual rights whatsoever." Offer Letters at 1.

The BPA sets forth the "terms and conditions under which Employee [Montes] will be employed by the Company [Paymentus], and certain restrictions applicable to Employee as a result of the employment with the Company." BPA § 1. For example, the BPA defines Montes' employment as "at will," *id.* § 3, contains an assignment of intellectual property provision, *id.* § 5, a non-disclosure and confidentiality provision, *id.* § 6, a provision requiring the return of company property at materials at the end of the employment, *id.* § 7, non-compete and non-solicitation provisions, *id.* §§ 8-9, and a non-disparagement clause, *id.* § 15.

The SPA on the other hand, effective as of December 19, 2022, addresses the terms of Paymentus's acquisition of Profit. SPA. The agreement covers topics like the purchase and sale of shares, *id.* § 1, representations and warranties, *id.* §§ 3-5, and closing deliveries and conditions to closing, *id.* § 6. The SPA also details the RSU and cash payments that are the subject of this case. *Id.* § 7.9.

The SPA, dated and effective as of December 19, 2022, contains the following arbitration clause:

> The Company [Profit], the Shareholders [including Montes], the Shareholder Representative [Montes] and the Purchaser [Paymentus] agree, on behalf of themselves, the Shareholder Indemnified Parties and the Purchaser Indemnified Parties, that any Action based on or arising out of this Agreement or for recognition and enforcement of any judgment in respect thereof brought by a party hereto, a Shareholder Indemnified Party or a Purchaser Indemnified Party, or their respective successors or assigns (other than a dispute governed by Section 2.3, which shall be governed by the terms of Section 2.3, and a dispute governed by Section 7.5 or Section 10.8, which shall be available to all parties hereunder) (a "Dispute"), shall first be submitted to mediation according to the Commercial Mediation Procedures of the American Arbitration Association ("AAA") (see www.adr.org).

*Id.* § 10.11(a).

Both offer letters as well as the BPA contain merger clauses. The merger clause in the Offer Letters state:

> This letter supersedes any prior or subsequent oral or written representations regarding the terms of potential employment with the Company [Paymentus]. By signing below, you acknowledge that you are not relying on any representations other than those set forth in the letter.

Offer Letters at 2. The BPA also contains a merger clause:

> This Agreement contains the entire agreement between the Parties relating to the subject matters contained herein. No term of this Agreement may be amended or modified unless made in writing and executed by both Employee [Montes] and an authorized officer of the Company [Paymentus]. This Agreement replaces and supersedes all prior representations, understandings, or agreements, written or oral, between Employee and the Company with regard to restrictive covenants, post-employment restrictions, and mandatory arbitration.

BPA § 20.

### C.     Procedural Background

Montes initiated this action on July 1, 2024. Compl. On October 11, 2024, Paymentus filed its Motion. Montes opposes. D.E. 16 ("Opposition" or "Opp'n"). Paymentus replies. Reply.

## II.    LEGAL STANDARD

The Federal Arbitration Act ("FAA") provides that a "written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity." 9 U.S.C. § 2. A party may petition a district court "which, save for such agreement, would have jurisdiction . . . for an order" compelling arbitration. 9 U.S.C. § 4. If the Court determines that an issue involved in the case is subject to arbitration, the Court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . ." 9 U.S.C. § 3.

The FAA "reflects an 'emphatic federal policy in favor of arbitration dispute resolution.'" *KPMG LLP v. Cocchi*, 565 U.S. 18, 21 (2011) (per curiam) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985)). However, "a party cannot be compelled to submit a dispute to arbitration unless it has agreed to do so." *Century Indem. Co. v. Certain Underwriters at Lloyd's London*, 584 F.3d 513, 524 (3d Cir. 2009). In deciding whether to compel arbitration under the FAA, courts first consider "'(1) whether there is a valid agreement to arbitrate between the parties and, if so, (2) whether the merits-based dispute in question falls within the scope of that valid agreement.'" *Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 220 (3d Cir. 2014) (quoting *Century Indem.*, 584 F.3d at 527).

When analyzing a motion to compel arbitration, the appropriate evidentiary standard depends on the pleadings. "[W]hen it is apparent, based on the face of a complaint, and documents relied upon in the complaint, that certain of a party's claims are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay." *Guidotti v. Legal Helpers Debt Resol., LLC*, 716 F.3d 764, 776 (3d Cir. 2013) (cleaned up). However, if (1) "the motion to compel arbitration does not have as its predicate a complaint with the requisite clarity to establish on its face that the parties agreed to arbitrate, or (2) "the opposing party has come forth with reliable evidence that is more than a naked assertion . . . that it did not intend to be bound by the arbitration agreement, even though on the face of the pleadings it appears that it did," the summary judgment standard in Federal Rule of Civil Procedure 56 applies and allows for limited discovery into whether there was an agreement to arbitrate. *Id.* at 774.

Here, Paymentus asserts that the Rule 12(b)(6) standard should govern. Mot. at 7. However, while Montes does not specify which evidentiary standard should govern, he argues that

7

the arbitration clause from the SPA was superseded by the BPA, and the BPA does not contain an arbitration clause. Opp'n at 1. The BPA is not referenced in the Complaint. Therefore, the Court concludes that the Rule 56 summary judgment standard should apply when determining whether this action is subject to arbitration. *See Guidotti*, 716 at 774.[4]

The Motion will therefore be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable trier of fact could find in favor of the non-moving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson*, 477 U.S. at 248).

Under Rule 56, a court must view the evidence presented in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. However, "conclusory, self-serving affidavits are insufficient" grounds to deny the motion," *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002), and statements of undisputed material facts may not "primarily rely on speculation and legal conclusions" or "fail[] to genuinely dispute the facts[.]" *Buxton v. Dougherty*, 821 F. App'x 70, 71 n.2 (3d Cir. 2020).

### III.   ANALYSIS

Paymentus argues that all counts must be arbitrated based on a binding arbitration agreement found in the SPA. *See generally* Mot. Montes disagrees and argues the BPA, which

---

[4] Neither party requests discovery and because the issue turns on contract construction and both parties have submitted the relevant agreements to the Court, the Court determines that discovery is unnecessary to resolve the Motion.

does not contain an arbitration clause, supersedes the SPA, and, alternatively, argues that the SPA's arbitration provision does not apply to Montes's employment claims (Counts III and IV). *See generally* Opp'n. The Court agrees with Paymentus and finds that all Counts are subject to the mandatory arbitration provision in the SPA.

A.  **There is a Valid Agreement to Arbitrate Counts I and II**

   1.  *The Court applies New Jersey law to find that the SPA's choice of law provision is applicable and dictates that Delaware law applies*

As a preliminary matter, the parties disagree on the choice of law governing the issue of arbitrability. Defendant contends Delaware law applies, Mot. at 9-12, while Plaintiff contends that New Jersey law applies, Opp'n at 10-15. The Court will apply Delaware law—the law the parties chose in the SPA.

Whether a party has agreed to arbitrate is determined by applying ordinary state-law principles. *See Century Indem.*, 584 F.3d at 524. "A federal court sitting in diversity jurisdiction must apply the forum state's choice of law rules" to determine what law governs the substantive issues of a case. *Maniscalco v. Brother Int'l Corp. (USA)*, 793 F. Supp. 2d 696, 704 (D.N.J. 2011). "New Jersey has adopted the 'most significant relationship' test of the Restatement (Second) of Conflict of Laws." *Id.* (citing *P.V. ex rel. T.V. v. Camp Jaycee*, 197 N.J. 132, 142-43 (2008)). First, the court "examine[s] the substance of the potentially applicable laws in order to determine if an actual conflict exists." *Id.* (citing *Camp Jaycee*, 197 N.J. at 143-44). Where there is no actual conflict, the court applies the law of the forum state. *See id.* "However, if the court finds that a conflict exists, the court must determine which jurisdiction has the 'most significant relationship' to the claim." *Id.* (citing *Camp Jaycee*, 197 N.J. at 136).

9

As to the question of actual conflict, there is a choice of law provision in the SPA designating Delaware law as the applicable law governing disputes. SPA § 10.11(d). Under Delaware law, courts apply the parties' chosen law unless application of that law "would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue . . . ." *Focus Financial Partners, LLC v. Holsopple*, 241 A.3d 784, 820 (Del. Ch. 2020). "New Jersey gives effect to contracting parties' private choice of law clauses unless they conflict with New Jersey public policy." *Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 331 n.21 (3d Cir. 2001). "Absent a compelling sense of inequity or injustice, courts do not seek to reorder the contracts of private parties." *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 614 A.2d 124, 149 (N.J. 1992).

Therefore, in determining whether there is a conflict between New Jersey and Delaware law, the question becomes whether New Jersey has a materially greater interest in the outcome of the matter than Delaware and, if so, whether the public policy of New Jersey requires a different outcome. However, here the Court need not decide which state has a materially greater interest in the outcome of the case because, even *if* New Jersey did have such an interest, its public policy is the same as that of Delaware with respect to the enforceability of the SPA's arbitration clause.

In Delaware, to be valid and enforceable, an arbitration provision must only meet the general requirements of a contract. *See Wells v. Merit Life Ins. Co.*, 671 F. Supp. 2d 570, 573-74 (D. Del. 2009) (applying Delaware law). "In Delaware a contract exists 'if a reasonable person would conclude, based on the objective manifestations of assent and surrounding circumstances, that the parties intended to be bound by their agreement on all essential terms.'" *Id.* (quoting *Patel v. Patel*, No. 07C-07-020 RRC, 2009 WL 427977, at *3 (Del. Super. Ct. 2009)). The parties'

intent is principally determined by examining the language of the contract. *See id.* (citing *E.I. Du Pont De Nemours and Co. v. Admiral Ins. Co.*, 711 A.2d 45, 56 (Del. Super. Ct. 1995)).

New Jersey law, on the other hand, treats employment and consumer contracts differently than commercial contracts. *See In re Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d 515, 525-26 (3d Cir. 2019) (collecting cases). For commercial contracts, like in Delaware, New Jersey enforces arbitration clauses where the parties express their intention to arbitrate—no special language is required. *See Gastelu v. Martin*, No. A-0049-14T2, 2014 WL 10044913, at *6, n.4 (N.J. Super. Ct. App. Div. July 9, 2015). However, for consumer or employment contracts where parties have "unequal bargaining power and levels of sophistication," a valid arbitration clause must (1) identify the general substantive area the arbitration; (2) reference the types of claims subject to arbitration; and (3) explain the difference between arbitration and litigation. *In re Remicade*, 938 F.3d at 525 (first citing *Garfinkel v. Morristown Obstetrics & Gynecology Assocs.*, 168 N.J. 124, 773 A.2d 665, 672 (2001); then citing *Moon v. Breathless Inc.*, 868 F.3d 209, 214-15 (3d Cir. 2017) (applying New Jersey law)).

While the Third Circuit in *Moon* wrote that these three requirements apply to arbitration clauses covering statutory rights, *see* 868 F.3d at 214, the Third Circuit later elaborated in *In re Remicade (Direct Purchaser) Antitrust Litig.* that the New Jersey supreme court has applied this rule "only in the context of employment and consumer contracts." 938 F.3d at 525. The Third Circuit also explained that the "twin concerns" animating the New Jersey Supreme Court's application of the rule were (1) that "a consumer is not necessarily versed in the meaning of law-imbued terminology about procedures tucked into form contracts" and (2) a "person would not be presumed to understand that what was being agreed to constituted a waiver of a constitutional or

statutory right." *Id.* (citing *Kernahan v. Home Warranty Administrator of Florida, Inc.*, 236 N.J. 301, 319-20 (2019)) (internal quotation marks omitted).

Here, the SPA is clearly a commercial contract negotiated by sophisticated parties that governs the terms of a corporate acquisition of Profit by Paymentus. The SPA addresses topics such as the purchase and sale of shares, SPA § 1, representations and warranties, *id.* §§ 3-5, and closing deliveries and conditions to closing, *id.* § 6. The SPA also details the RSU and cash payments that are the subject of the dispute here. *Id.* § 7.9. Furthermore, Montes does not dispute that he was represented by sophisticated counsel when drafting and signing the SPA. Mot. at 3; *see generally* Opp'n.

Thus, the Court finds that the arbitration agreement is enforceable under both Delaware and New Jersey law, even if it applies to Counts III and IV, and therefore, that no conflict of laws exists. As such, applying New Jersey law, this Court must, in turn, enforce the parties' choice of law provision in the SPA—Delaware law.[5] *See Gen. Motors*, 263 F.3d at 331 n.21.

> 2. *There is an unambiguous intention to arbitrate claims based on or arising out of the SPA*

The Court further finds that the following provision in the SPA evidences a clear and unambiguous intention to arbitrate all claims "based on or arising out of [the SPA]":

> The Company [Profit], the Shareholders [including Montes], the Shareholder Representative [Montes] and the Purchaser [Paymentus] agree, on behalf of themselves, the Shareholder Indemnified Parties and the Purchaser Indemnified Parties, that **any Action based on or arising out of this Agreement or for recognition and enforcement of any judgment in respect thereof brought by a party hereto**, a Shareholder Indemnified Party or a Purchaser Indemnified Party,

---

[5] As explained above, even if the Court did not abide by the choice of law provision and applied New Jersey substantive law to determine the enforceability of the arbitration agreement, the Court would find that the agreement is enforceable as the heightened rule requiring specific disclosures in the arbitration agreement is inapplicable to a commercial contract between sophisticated parties such as the SPA. *See Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d at 525.

> or their respective successors or assigns (other than a dispute governed by Section 2.3, which **shall be governed by the terms of Section 2.3, and a dispute governed by Section 7.5 or Section 10.8, which shall be available to all parties hereunder) (a "Dispute"), shall first be submitted to mediation according to the Commercial Mediation Procedures of the American Arbitration Association ("AAA")** (see www.adr.org).

*Id.* § 10.11(a) (emphasis added). Therefore, there is a valid agreement to arbitrate. *See Wells v. Merit Life Ins. Co.*, 671 F. Supp. 2d 570, 573-74 (D. Del. 2009).

### 3. The arbitration clause covers all counts in the Complaint

There is no dispute that if the arbitration clause is valid and enforceable, it covers the contract claims in Counts I and II. Opp'n at 7-9.[6] Paymentus argues that Montes's retaliation claims, Counts III and IV, are also covered by the SPA's arbitration clause. Mot at 13-16. Montes argues that the SPA's arbitration provision is narrow and does not cover Counts III and IV. Opp'n at 7-9. The Court agrees with Paymentus.

"[O]nce a court has found that there is a valid agreement to arbitrate . . . the determination of whether a particular dispute is within the class of those disputes governed by the arbitration clause . . . is a matter of federal law." *Century Indem.*, 584 F.3d at 524 (cleaned up). Federal law has a presumption in favor of arbitrability. *See id.* This presumption can only be overcome with "positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Tech., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986). "If the allegations underlying the claims 'touch matters' covered by [an arbitration agreement], then those claims must be arbitrated, whatever the legal labels attached to them." *Brayman Constr. Corp. v. Home Ins. Co.*, 319 F.3d 622, 626 (3d Cir. 2003) (cleaned up).

---

[6] Montes separately argues that Counts I and II should not be arbitrated because the BPA supersedes the SPA. Opp'n at 6-7. As discussed *infra*, Section III(B), the Court rejects this argument.

13

The Court finds that the SPA's arbitration clause is susceptible to an interpretation that covers the disputes in Counts III and IV. The arbitration clause covers "any Action based on or arising out of [the SPA]." SPA § 10.11(a). According to Oxford Learner's Dictionaries, to "base something on/upon something" is "to use an idea, a fact, a situation, etc. as the point from which something can be developed." *Base on*, Oxford Learner's Dictionaries, https://www.oxfordlearnersdictionaries.com/us/definition/english/base-on (last visited March 26, 2025). Therefore, to the extent Montes's claims in Counts III and IV are developed by terms of the SPA, the arbitration clause can be interpreted as covering those claims.

The gravamen of Montes's claims in Counts III and IV is that Paymentus fired him in retaliation for insisting on the RSUs and retention payments due to him under the SPA. Without passing on the merits of these claims, what Montes is allegedly owed under the SPA is the starting point for his retaliation claims. Even if Montes put forward an alternative interpretation of what "based on" means here, at very least there is some doubt as to whether Counts III and IV are covered under the arbitration clause and "'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . .'" *Chassen v. Fid. Nat'l Fin. Inc.*, 836 F.3d 291, 295 (3d Cir. 2016) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)).

B.    The BPA Does Not Supersede The SPA

Montes seeks to escape the SPA's arbitration clause by pointing to the fact that he signed the BPA, which contains a merger clause and does not require arbitration, as well as the two Offer

14

Letters, and argues that the BPA supersedes and replaces the SPA's arbitration agreement. Opp'n at 6-7.[7] The Court is not persuaded.

Simply put, the BPA cannot supersede the SPA because the effective date of the SPA is after that of the BPA. The BPA clearly states that it "is made effective as of the date the Agreement is executed" by Montes, which was December 6, 2022. BPA at 1, 9. The SPA, on the other hand, clearly states that it is effective as of December 19, 2022. SPA at 1. Under Delaware law, when the face of the contract is clear as to the effective date, courts honor the effective date in an agreement. *See AgroFresh Inc. v. MirTech, Inc.*, 257 F. Supp. 3d 643, 661 (D. Del. 2017) (applying Delaware law). However, under New Jersey law, the "determination of which date controls the application of the contract must be derived from the intent of the parties, and if no subjective intent is apparent or ascertainable, that intent must be based on the objective language of the contract." *State Troopers Fraternal Ass'n of New Jersey, Inc. v. State*, 149 N.J. 38, 49 (1997). Here, like in *State Troopers*, the best indicator of the parties' intent is the date specified in the contracts themselves. Therefore, under both New Jersey and Delaware law, the BPA cannot supersede the SPA as a matter of simple timing.

Furthermore, the fact that Montes signed the Dec. 21 Offer Letter after the BPA does nothing to change the effective date of the BPA. The Dec. 21 Offer Letter's only reference to the BPA is as follows: "Employment with the Company also is conditioned upon your expectation and compliance with a Business Protection Agreement which is attached to this offer letter." Dec. 21 Offer Letter at 1. The Dec. 21 Offer Letter attaches the BPA, which was previously executed by Montes on December 6, 2022. BPA; Montes Decl. ¶ 4. The Dec. 21 Offer Letter does not have

---

[7] Montes does not argue that the merger clause in the Offer Letters supersedes the arbitration agreement in the SPA. *See generally* Opp'n.

any language indicating an intent to alter the effective date of the BPA, a contract that was previously entered into by the parties, and Montes did not re-execute the BPA on December 21, 2022.

As Paymentus points out in reply, Montes "does not cite to any case law or authority to support his argument that the execution of an offer letter that merely references compliance with an agreement impacts the effective date of that agreement." Reply at 6. Nor is the Court aware of any. To the contrary, under New Jersey law, to modify a contract with a new effective date, there must be "an explicit agreement to modify or . . . actions and conduct of the parties as long as the intention to modify is mutual and clear." *Wells Reit II-80 Park Plaza, LLC v. Director, Div. of Taxation*, 414 N.J. Super. 453, 466 (N.J. App. Div. 2010). To the extent Montes argues that the BPA is novated rather than modified, the elements of novation are: "(1) a previously valid contract; (2) an agreement to make a new contract; (3) a valid new contract; and (4) an intent to extinguish the old contract." *Id.* Montes does not argue, let alone meet, the elements for modification or novation.

Perhaps more to the point, *even if* the timing of the contracts were not an issue for Montes, the scope of the BPA's merger clause clearly encompasses only those agreements "relating to the subject matters contained [in the BPA]." BPA § 20. The entirety of the merger clause contained in the BPA is as follows:

> This Agreement contains the entire agreement between the Parties relating to the subject matters contained herein. No term of this Agreement may be amended or modified unless made in writing and executed by both Employee and an authorized officer of the Company. This Agreement replaces and supersedes all prior representations, understandings, or agreements, written or oral, between Employee and the Company with regard to restrictive covenants, post-employment restrictions, and mandatory arbitration.

16

*Id.* Montes conspicuously omits the first sentence of the merger clause in his Opposition, Opp'n at 6, and with it the limiting language that the merger clause applies to agreements "relating to the subject matters contained herein." BPA § 20.

Therefore, the question becomes whether the SPA relates to the subject matter of the BPA. The Court finds that it does not. The BPA sets forth the "terms and conditions under which Employee [Montes] will be employed by the Company [Paymentus], and certain restrictions applicable to Employee as a result of the employment with the Company." *Id.* § 1. For example, the BPA defines Montes' employment as "at will," *id.* § 3, contains an assignment of intellectual property provision, *id.* § 5, a non-disclosure and confidentiality provision, *id.* § 6, a provision requiring the return of company property at materials at the end of the employment, *id.* § 7, non-compete and non-solicitation provisions, *id.* §§ 8-9, and a non-disparagement clause, *id.* § 15.

The SPA on the other hand, addresses the terms of Paymentus's acquisition of Profit and covers topics like the purchase and sale of shares, SPA § 1, representations and warranties, *id.* §§ 3-5, closing deliveries and conditions to closing, *id.* § 6, and RSUs and retention payments owed to Montes, *id.* § 7.9. Therefore, separate and apart from the fact that the BPA's effective date is earlier in time than the SPA's effective date, the Court finds that the SPA does not "relate to" the subject matter of the BPA and, therefore, the BPA cannot supersede the arbitration clause in the SPA.[8]

    **C.**    **The Court Will Stay This Case Pending Arbitration**

Although Paymentus's Motion seeks dismissal of this action in addition to compelling arbitration, Paymentus later requests that the Court stay the action rather than dismiss it. Reply at

---

[8] The Court notes that Montes does not even reference the BPA in the Complaint.

1, 9. As the Court has determined that this action is subject to mandatory arbitration, and because Paymentus has requested a stay pending arbitration, the Court will **STAY** this matter until such arbitration has concluded pursuant to 9 U.S.C. § 3.

IV.     **CONCLUSION**

For the foregoing reasons, the Court will **GRANT** the Motion, **COMPEL** arbitration of all Counts in accordance with the arbitration provision in the SPA, and **STAY** this case.

Dated: April 14, 2025

_____
Evelyn Padin, U.S.D.J.